## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **ANTHONY TROY BRAXTON,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:21CV00051 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **S. FLETCHER, ET AL.,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendants. | ) | |

*Anthony Troy Braxton, Pro Se Plaintiff; Kathleen Mary McCauley, Taylor Denslow Brewer & Katherine E. Morley and Taylor D. Brewer, MORAN REEVES & CONN PC, Richmond, Virginia, for Defendants S. Fletcher, Deborah Ball, Dr. Fox, B. Witt, & S. Anderson; Timothy E. Davis, Assistant Attorney General, CRIMINAL JUSTICE & PUBLIC SAFETY DIVISION, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Defendants J. Dillman & Assistant Warden Fuller.*

The plaintiff, Anthony Troy Braxton, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, alleging that the defendants violated his Eighth Amendment rights with regard to complications from treatment for a deep vein thrombosis (DVT). Liberally construed, his Amended Complaint also asserts state-law claims of negligence or medical malpractice and a claim under the Health Insurance Portability and Accountability Act (HIPAA).

Defendants J. Dillman and Assistant Warden Fuller (collectively the Nonmedical Defendants) have filed a Motion to Dismiss all claims against them, and the remaining defendants — S. Fletcher, Deborah Ball, Dr. Fox, B. Witt, and S. Anderson (collectively the Medical Defendants) — have filed a Motion for

Summary Judgment.  Braxton has filed an opposition to both motions, and the Medical Defendants have filed a reply.

Finding the matters ripe for disposition, I conclude that the defendants' dispositive motions must be granted.

I. BACKGROUND.

A.  Plaintiff's Allegations in the Amended Complaint.

The allegations underlying Braxton's claims occurred while he was confined at Red Onion State Prison (Red Onion), a Virginia Department of Corrections (VDOC) facility, where he has been housed off and on since he entered VDOC custody.  At the relevant time, J. Dillman was the Chief of Operations for VDOC Health Service, and defendant Fuller was the Assistant Warden at Red Onion.

Braxton's Amended Complaint alleges that he was diagnosed with DVT in his left lower extremity on January 29, 2019, and was transported to an outside hospital for treatment.  Braxton alleges that the medical staff at Red Onion did not follow the aftercare plan and that they were deliberately indifferent to pain he experienced in January and February 2020.  Ultimately, he was sent to the hospital for treatment on February 6, 2020.

Braxton's medical care is discussed in more detail below in the context of addressing the Medical Defendants' Motion for Summary Judgment.  As is relevant to the Motion to Dismiss (brought only by Fuller and Dillman), Braxton alleges that

Fuller was present on February 6, 2020, when Braxton was brought to the medical department, told that his lab results were very serious, and told he was being sent to the hospital.  He was treated at the hospital as further explained below.

Several days after his return to Red Onion, he filed a grievance complaining about his medical treatment over the preceding year.  It was determined that the grievance was unfounded and responded to Braxton's filings by stating that "24 hour medical care is available to all offenders."  Am. Compl. ¶ 40, ECF No. 56.  Braxton appealed the Level I grievance response to the regional office, and defendant Dillman denied the grievance at Level II.

Braxton's amended complaint asserts Eighth Amendment claims against all defendants.  Although he initially sought relief against them in their official capacities, he has since stipulated to the dismissal of his official-capacity claims. Resp. Opp'n Mot. Dismiss Braxton Aff. 8, ECF No. 74-1.  The Amended Complaint also asserts a HIPAA claim and state-law negligence claims against the medical defendants.  Braxton's HIPAA claim appears to be based on his assertion that he repeatedly requested his medical records after the February events and did not receive them for months.

For relief, Braxton requests declaratory relief and an injunction requiring the Medical Defendants to "value HIPAA laws and adhere 100% to its regulations." Am. Compl. ¶ 50, ECF No. 56.  He also seeks compensatory damages and costs.

-3-

### B.  Evidence Related to Braxton's
### DVT and Treatment.

All five of the Medical Defendants have filed affidavits in conjunction with their Motion for Summary Judgment, and they also have provided Braxton's Red Onion medical records as an exhibit.  Those documents set forth the following facts, which are undisputed unless otherwise noted.

### 1.  Overview of Medical Defendants'
### Interactions with Braxton.[1]

Dr. Fox is a licensed physician and has been Board Certified in emergency medicine since 2004.  He worked for six years for VDOC providing health care services to inmates, including inmates at Red Onion.  He plays no role in the review of or response to kiosk requests or grievances, so he has no knowledge of any such requests made by Braxton.

Deborah Ball is a nurse practitioner who works for VDOC providing medical care to inmates at Red Onion.  Ball responded to several of Braxton's medical requests, grievances, and provided care to him for about two years preceding the date of her affidavit.

---

[1]  Since Braxton's February 2020 hospitalization, Ball has seen Braxton periodically on several occasions, and Dr. Fox's next involvement was a review of Braxton's chart in September 2020.  Because Braxton's Amended Complaint does not assert claims  about any care he received after February 6, 2020, I do not include a description of it.

The other three medical defendants are all registered nurses. Samantha Anderson worked at Red Onion providing nursing care to inmates until July 2020. She cared for Braxton a few times in early 2020. Beverly Witt's interaction with Braxton consisted of her responding in 2020 to an informal complaint Braxton had submitted to the medical staff. Sherry Fletcher responded to Braxton's emergency grievance on February 5, 2020.

### 2. Braxton's Medical Treatment.

As noted, Braxton was diagnosed with DVT on January 29, 2019, and transferred from Red Onion to Mountain Valley Regional Medical Center for treatment. A DVT is a blood clot, usually occurring in the leg, which causes swelling, pain, and tenderness, and can be life-threatening if not treated. To prevent future blood clots, people who experience a DVT often begin taking a blood-thinning medication like Coumadin to prevent future blood clots, and they often remain on blood-thinners for life.

Coumadin users must undergo serial INR tests to measure their blood-clotting time and allow health care providers to determine the appropriate medication dosage. The defendants explain that INR (an abbreviation of "international normalized ratio") scoring is a measure of the time in which the blood clots. In average healthy people, an INR of 1.1 or below is considered normal. An INR range of 2.0 to 3.0 is generally an effective therapeutic range for people taking the blood thinner warfarin

(the generic name for drugs like Coumadin) for disorders such as a blood clot in the leg or lung, and Braxton's level needed to be between 2.0 and 2.5.

If a patient's INR is lower than the therapeutic level, the patient is a risk for forming clots; if it is too high, there is a risk of excessive bleeding, which may be life threatening.   N. Amer. Thrombosis Forum, *A Guide to INR Levels,* https://www.thrombosis.org/2020/11/guide-inr-levels/ (last visited Oct. 21, 2022). Blood-thinner dosages are frequently adjusted in response to INR levels to ensure the patient receives the recommended level.   Because INR levels fluctuate, identifying the appropriate dose that both manages the patient's condition and avoids unwanted side effects, such as easy bruising and bleeding, is a delicate balance.

When Braxton was discharged back to Red Onion on January 31, 2019, the discharge instructions stated that he should continue "therapy with Lovenox [another blood-thinner] until INR is greater than or equal to 2 and continue treatment with Warfarin for at least 3 months."  Mem. Supp. Mot. Summ. J. Ex. F, Med. R., ECF No. 64-6, at 119.[2]

Upon Braxton's return to Red Onion, Ball reviewed the discharge instructions from the hospital.   She provided a verbal order that Braxton's INR initially be determined  daily and that she be called with the results. Throughout 2019, providers

---

[2]   In his Amended Complaint, Braxton claims that the hospital physician said he should be removed from the medication after three months, but that it not supported by the hospital records.

at Red Onion tested Braxton's INR multiple times and Ball adjusted his Coumadin dosage according to the results.

On January 3, 2020, Anderson drew blood from Braxton to test his INR level. The results, returned on January 8, 2020, showed that his INR was below the desired level.  Accordingly, Ball placed Braxton on the list to be seen by Dr. Fox.

Dr. Fox met with Braxton — for the first time — on January 15, 2020.  He examined Braxton and noted he was alert and oriented.  According to the medical records and Dr. Fox's affidavit, Braxton did not complain of abdominal or kidney pain at that time and voiced no complaints.  Braxton alleges that he complained of pain.  Dr. Fox reviewed his lab results and his history, including the records detailing his DVT history.  Based on Braxton's elevated risk for recurring blood clots, and his recent sub-therapeutic INR level, Dr. Fox decided he would benefit from an increased dosage of blood thinner medicine, and so increased Braxton's dosage.  Dr. Fox further ordered that an INR blood draw be repeated in one month.  Med. R. 30–31, ECF No. 64-6.  Pursuant to Dr. Fox's order, a repeat blood draw was performed on February 5, 2020.

On February 3, Braxton complained anew of problems with his left lower leg, although he denied increased pain and there was no edema in his lower leg.  He was instructed to elevate his leg, use wet warm compresses, and to continue to take his pain medicine.  The note in his chart also states that he should follow up as needed

("pnr").  *Id*. at 29.  After being told of this complaint, Ball ordered a urine sample on the same date, which also was obtained from Braxton on February 5, 2020, the same day as his blood draw.  The results of the urinalysis in the facility showed slight blood proteins, so medical staff sent the sample to the lab to be tested and the results returned later that day as normal.

Also on February 5, 2020, Braxton submitted an emergency grievance to the medical staff stating, "[for] a few days my stomach and kidneys have been in extreme pain. I seen [sic] the nurse yesterday and today peed in a cup sometime around 7:15 pm. I used the bathroom and blood came out. I've pee[d] blood twice." Compl. Attach. 5, ECF No. 1-1.  In response to Braxton's emergency grievance, Fletcher reviewed his chart and confirmed he had provided a urine sample, as well as blood for an INR draw.  She responded to his grievance assuring him that his urine and blood would be tested, and she administered Tylenol for his pain.

Fletcher states that Braxton was in no acute distress and she did not believe he was experiencing a medical emergency.  Although she was not authorized to make medical diagnoses, she suspected that he had a kidney stone, which—while painful—"typically are not medical emergencies."  Mem. Supp. Mot. Summ. J. Ex. E, Fletcher Aff. ¶ 13, ECF No. 64-5.  Braxton disputes some of her testimony.  In particular, he claims that Fletcher did not call him to medical and did not physically assess him.  She simply handed him Tylenol at pill-call and he later received her

emergency grievance denial.  At the time, he claims he was in serious pain.  Mot. Opp'n Mot. Summ. J. Attach. Braxton Aff. ¶ 13, ECF No. 94-2.

The following morning, on February 6, 2020, at 7:35 a.m., the results from the INR draw returned as critically elevated at more than 10.0.  Ball gave a verbal order to repeat the blood draw to ensure accuracy of the result.  The results of the repeat draw returned at 11:13 a.m. and revealed an INR of 12.1.  Ball ordered that Braxton be transferred to Norton Community Hospital for treatment of his elevated INR, and that his Coumadin be discontinued in the meantime.

In response to Braxton's allegations that Anderson and Ball, if not others, knew of his INR levels and failed to inform him, Anderson explains that once she received the first critical lab value at 7:35 a.m., she followed Ball's orders to repeat the draw for accuracy, which she performed at 8:45 a.m.  She states that they were not certain that his INR level was, in fact, critically elevated until the results from the second draw returned at 11:13 a.m.  She states, "There was no reason for me (or anyone else) to worry Mr. Braxton about the first result, as it would have caused unnecessary concern had it been inaccurate."  Mem. Supp. Mot. Summ. J. Ex. C, Anderson Aff. ¶ 17, ECF No. 64-3.  Moreover, as soon as the result was returned, arrangements were made to have Braxton transported to the hospital.

Braxton arrived at Norton Community Hospital around 3:00 pm and was admitted overnight for evaluation and treatment with Vitamin K.  A CT scan of his

abdomen was performed for suspicions of a kidney stone, and the results were normal. Braxton was discharged back to Red Onion the next day, February 7, 2020.

On February 10, 2020, Braxton submitted the following informal complaint to the medical staff:

> I the above offender was hospitalized from blood clots back in January of 2019. In my return to the institution I never once seen [sic] the doctor for my clotting problem. It was [not] until a year later that I seen [sic] the doctor for a kidney problem. When I told her about my kidneys and stomach problems, I was told it wasn't a result of my clotting. This led to internal bleeding within my stomach and urine.

Compl. Attach. 1, ECF No. 1-1.

The medical department received Braxton's informal complaint on February 12, 2020, and Witt responded on February 24, 2020. She recounted his recent medical visits, assured him that his labs were being closely monitored, and advised that his medication would be adjusted as necessary. Witt further instructed him to submit the appropriate paperwork if he wished to be seen by a provider.

Braxton appealed, and Fuller denied the level one appeal on March 31, 2020. Dillman denied the next level of appeal.

## II. DISCUSSION.

### A. The Nonmedical Defendants' Motion to Dismiss.

#### 1. Standard of Review.

A district court should dismiss a complaint under Rule 12(b)(6) if, accepting all well-pleaded allegations in the complaint as true and drawing all reasonable

factual inferences in the plaintiff's favor, the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.[3] Moreover, a court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

### 2. *Eighth Amendment Deliberate Indifference to Serious Medical Needs.*

To state a claim under § 1983, a plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Loftus v. Bobzien*, 848 F.3d 278, 284–85 (4th Cir. 2017). The plaintiff also must state facts to affirmatively show that each defendant acted personally to deprive the plaintiff of, or violate, his constitutional rights. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

Braxton argues that all of the defendants violated his Eighth Amendment rights. The Eighth Amendment's protections against cruel and unusual punishment

---

[3]   I have omitted internal quotation marks, alterations, and citations here and throughout this Opinion, unless otherwise noted.

include a right to the medical care necessary to address an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). Specifically, "a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019).

To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Id.* at 356–57. The first component is an objective inquiry and the second is subjective. *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994). "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). It is not sufficient to show that an official should have known of a risk. He or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk of harm posed by the official's action or inaction. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).

Moreover, the "deliberate indifference standard is not satisfied by a showing of mere negligence, a mere error of judgment or inadvertent failure to provide medical care, or mere disagreement concerning questions of medical judgment." *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013) (unpublished). Similarly, "a prisoner does not enjoy a constitutional right to the treatment of his or her choice" so long as the medical treatment provided is adequate. *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013). Indeed, a healthcare provider's treatment will not qualify as deliberate indifference unless it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

### 3. Eighth Amendment Claims Against Nonmedical Defendants.

The Nonmedical Defendants (Dillman and Fuller) seek dismissal of Braxton's claims for failure to state a claim. In terms of their personal involvement, Braxton alleges only that Fuller denied his level one grievance appeal and that Fuller was present at the meeting when Braxton was told his INR numbers were extremely high and he would be taken to the hospital. As to Dillman, he alleges only that he denied his level two grievance appeal after his February 2020 hospitalization.

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual

actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Braxton has not alleged any facts, however, that would show that either Dillman or

Fuller knew about his serious medical condition and failed to take any appropriate

action. First of all, Fuller's mere presence the day Braxton was sent to the hospital

cannot make him liable under the Eighth Amendment. At the time, Braxton was

being treated by medical staff and being sent to the hospital. It is unclear what else

he believes Fuller should have done.

Likewise, the fact that Dillman or Fuller denied his grievance about the

medical care he had received, *after* he had been hospitalized and treated, does not

state a constitutional violation. First of all, "a prison official's act of responding to

a grievance generally does not cause or contribute to a constitutional violation"

particularly when the grievance complains of past or completed misconduct, as is

the case here. *Hoglan v. Robinson*, No. 7:16-CV-00595, 2022 WL 909041, at *2

(W.D. Va. Mar. 28, 2022) (citing *George v. Smith*, 507 F.3d 605, 609 (7th Cir.

2007)).

Moreover, in responding to his complaints about a lack of care over the

preceding year, Dillman and Fuller were entitled to rely on the judgments of

Braxton's treating providers as to whether Braxton required different or additional

treatment. *Miltier*, 896 F.2d at 851 (holding that non-medical supervisory prison

officials are entitled to rely on professional judgment of trained medical personnel);

*Iko ex rel. Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008) (holding that where "a prisoner is under the care of medical experts, . . . a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands").  This reliance is particularly appropriate because his grievance appeals were denied after it was shown that he had since received treatment (a hospital stay) for the condition about which he was complaining.  They also properly directed him that, if he had ongoing concerns, he should submit a sick call slip and speak to a health care provider.

Braxton emphasizes that he is proceeding on a theory of supervisory liability, Braxton Aff. 6–7, ECF No. 74-1.  But he has not plausibly alleged a supervisory liability claim against either of these defendants.  To state such a claim, he would have to allege facts that the defendant (1) "had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) that the defendant's "response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'"; and (3) that there was an "affirmative causal link" between the defendant's conduct and plaintiff's "particular constitutional injury."  *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).  Braxton's amended complaint does not contain even conclusory statements establishing these

-15-

elements, let alone alleged facts to plausibly state such a claim. Indeed, because Braxton's own allegations show, at most, that Fuller knew of his medical condition on the same day he went to the hospital, and Fuller and Dillman both responded to grievances *after* Braxton had been sent to the hospital for treatment, he cannot show any causal connection between their conduct and the alleged constitutional violations by other defendants, all of which occurred earlier. Accordingly, any supervisory liability claim fails.

For the above reasons, I conclude that the allegations in the complaint fail to state plausible claims of deliberate indifference against these defendants. Therefore, I will grant the Nonmedical Defendants' Motion to Dismiss.

### B. The Medical Defendants' Motion for Summary Judgment.

#### 1. Standard of Review.

A court should grant summary judgment under Rule 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> In considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The plaintiff is entitled to have the credibility of all his evidence presumed. The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. The opposing party must demonstrate that a

-16-

triable issue of fact exists; he may not rest upon mere allegations or denials. A mere scintilla of evidence supporting the case is insufficient.

*Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

The defendants have filed supporting affidavits and Braxton's medical records, as well as other documents. Accordingly, to avoid summary judgment, Braxton must present sufficient evidence that could carry the burden of proof of his claims at trial. He "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his favor. *Anderson*, 477 U.S. at 248.

Braxton's opposition to the summary judgment motion includes an affidavit, which I have considered, although much of it consists of general assertions or legal conclusions, as opposed to specific facts. *Baber ex. rel. Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992) ("[U]nsupported speculation is not sufficient to defeat a summary judgment motion."). I also consider the allegations in both of his verified complaints, if based on personal knowledge, as offered in opposition to summary judgment. *Goodman v. Diggs*, 986 F.3d 493, 498–99 (4th Cir. 2021) (holding that even where a verified complaint has been superseded for pleading purposes, it still has evidentiary value and can be considered an affidavit for summary judgment purposes); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (explaining that a pro se litigant's verified complaint must be considered as an affidavit and may, standing alone, defeat a motion for summary judgment when the

allegations contained therein are based on personal knowledge).

### 2. Eighth Amendment Claims Against
### Medical Defendants.

As noted, *supra* Section II-A-2, to succeed on an Eighth Amendment claim, Braxton must show that each defendant engaged in conduct that showed deliberate indifference to a serious medical need. Upon review of the summary judgment record, I conclude that all of the Medical Defendants are entitled to summary judgment in their favor as to the Eighth Amendment claims.

First of all, as to Braxton's claim that he never saw a doctor in the year after returning from the hospital, Braxton was regularly tested and monitored by Ball, a nurse practitioner. It is undisputed that she regularly had him tested and adjusted his medication dosage to try to keep his INR within recommended limits. Braxton does not dispute this.

Additionally, although Braxton makes the general statement that he complained throughout the year, he does not point to any specific dates, except for three. His medical records reflect that there were other times in 2019 when he complained about things that could have been related to his DVT treatment, but he also was evaluated, and adjustments made to his medication during that time.

The first specific date he identifies as one when he complained about anything potentially related to his DVT treatment was December 30, 2019, almost a year after his DVT was initially treated at the hospital. At that time, he was given an

-18-

appointment with Dr. Fox.  There is a potential dispute of fact in that Braxton states that he complained about abdominal and kidney pain at his January 15, 2020, appointment, while Dr. Fox avers — and Braxton's medical records confirm — that he did not voice any complaints of pain directly to Dr. Fox.  For purposes of this summary judgment opinion, I assume Braxton voiced complaints.  Even so, Dr. Fox reviewed his paperwork, adjusted his medication accordingly, and scheduled him for follow-up testing.

Braxton may have wanted Dr. Fox to do more, but Dr. Fox treated him and was not deliberately indifferent.  Disagreement with a health care provider's choice of treatment does not give rise to an Eighth Amendment violation.  *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) (unpublished); *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985).  Likewise, even if Dr. Fox was negligent in his treatment, that would not violate the Eighth Amendment.  *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998); *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008) (unpublished) ("[N]egligent medical diagnoses or treatment, without more, do not constitute deliberate indifference.").

Nor was Ball deliberately indifferent toward his serious medical needs.  Indeed, the record reflects her continued monitoring of Braxton throughout 2019.  She repeatedly ordered labwork for him and adjusted his medication in light of the results received.  She did not ignore his complaints or fail to treat him.  Nor does her

decision to continue the Coumadin beyond three months contradict or otherwise fail to implement the hospital physician's orders, which required at least three months of Coumadin therapy.

Braxton also complains that Ball and Anderson were deliberately indifferent on February 6, because there was a short period of time when they had received his first concerning lab results, but they waited to tell him until they had confirmed the accuracy of the test. They have expressed valid and reasonable reasons for doing so, however. Specifically, they did not want to worry him in case the first result was inaccurate. Moreover, he has not alleged or shown that a couple hours' delay in getting him to the hospital caused him any harm. *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (unpublished) (explaining that a delay in receiving medical care violates the Eighth Amendment only "if the delay results in some substantial harm to the patient, such as a marked exacerbation of the prisoner's medical condition or frequent complaints of severe pain" and citing to both prior unpublished Fourth Circuit opinions and precedent from other courts of appeals). Thus, I cannot find that the decision to wait to speak with Braxton until the test results were confirmed constituted deliberate indifference, nor has he presented facts to show that she otherwise violated his Eighth Amendment rights.

As to the three nurses, their involvement was limited. All that Anderson did was draw Braxton's blood on several occasions. There is no evidence that she failed

to treat him or failed to properly report any of the lab results.  As with Ball, moreover, the allegation that Anderson waited to report his results until they were confirmed was not deliberate indifference, as just explained.  He simply has not presented sufficient information that she was deliberately indifferent.

Witt's involvement was limited to responding to an informal complaint submitted on February 10, 2020, *after* Braxton was sent to the hospital on February 6, 2020.  In response, she recounted the recent medical care he had received, assured him that his labs were being monitored, and instructed him to submit the appropriate paperwork if he wanted to be seen by a provider.  As with defendants Fuller and Dillman, Witt's denial of Braxton's grievance after the alleged failure to provide care does not give rise to an Eighth Amendment violation.  In short, he has not shown that she was subjectively aware of any need for treatment and failed to provide it.[4]

Lastly, Fletcher was responsible for responding to Braxton's emergency grievance on February 5, 2020, and it is undisputed that she checked his chart to make sure that he had given a urine sample and that she gave him Tylenol, and she has stated that he was not in any acute distress.  He has alleged that he was in serious

---

[4]  Although Braxton accuses Witt of knowing about his elevated levels and failing to do anything, Witt has testified that she did not know anything about his elevated INR level until afterward, and that she did not fail to inform him "of a fact about which [she] did not know."  Mem. Supp. Mot. Summ. J. Ex. D, Witt. Aff. ¶ 10, ECF No. 66.  Braxton offers nothing based on personal knowledge or any medical records to refute this testimony.

pain, which I must credit in evaluating the defendants' summary judgment motion. And, as it turns out, his condition was more serious than Fletcher realized at the time. Nonetheless, I cannot conclude that her conduct toward him was deliberately indifferent. She gave him medicine for the pain and checked his chart, and she did not subjectively believe that he was in acute distress. She also knew that the results of his tests would give the medical staff additional information to diagnose his problem. Even if she was negligent in her treatment, moreover, negligence is insufficient to state an Eighth Amendment violation. *Johnson*, 145 F.3d at 168.

For support that his complaints were ignored, Braxton points to three dates in which he says he "cr[ied] for help," over his swollen leg, blood in his urine, and spitting up blood: January 28, 2019, December 30, 2019, and February 5, 2020. Braxton Aff. ¶ 10, ECF No. 94-2. He states that each time, he was told that his grievance did not meet the definition for an emergency.

Although he may have been told his issue was not an emergency, he nonetheless received prompt medical care in each of these instances. Indeed, his undisputed medical record also reflects that each of these times when he complained, medical personnel took steps in response to his complaint. As for the January 28, 2019, complaint, he was taken to the hospital the next day, after being examined. He was admitted to the hospital and received treatment there for his DVT.

The next time he complained was almost a year later, on December 30, 2019. As already discussed, he was scheduled to see Dr. Fox at that time. When he complained on February 5, 2020, he was told that his recent blood and urine samples were in the process of being analyzed and that he would be given the results when they were returned. He does not explain what else he believes any of the medical personnel should have done at any of these stages.

Braxton points out the fear that he felt upon learning of his extremely high INR numbers and being told that his condition was serious. Certainly, that circumstance was unfortunate and understandably upsetting. Thankfully, he was able to get treatment quickly at the hospital to correct his levels. But bad results alone do not support a finding of deliberate indifference. *Jackson*, 775 F.3d at 178 (noting that although the defendant's treatment decisions "may have been mistaken, even gravely so," they fell "short of showing deliberate indifference"). The appropriate inquiry is on what the medical providers did in light of what they knew. And that inquiry does not reveal deliberate indifference in this case.

In short, there are not sufficient facts from which a reasonable jury could find that any of the Medical Defendants responded to Braxton's complaints with conduct that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851. I will therefore grant the Medical Defendants' Motion for Summary Judgment on

Braxton's Eighth Amendment claims.

### 3. HIPPA Claims and State-law Claims

To the extent Braxton is attempting to assert a claim under HIPAA, his claim fails. The Fourth Circuit has squarely held that the statute does not create a private cause of action, and thus that a § 1983 claim cannot be based on a violation of HIPAA. *Payne v. Taslimi*, 998 F.3d 648, 660 (4th Cir. 2021).

Lastly, in light of the dismissal of all federal claims, I decline to exercise jurisdiction over any state-law claims in Braxton's complaint, including any claims for negligence or medical malpractice. 28 U.S.C. § 1367(c)(3). Such claims will be dismissed without prejudice.

### III. CONCLUSION.

In accordance with the foregoing, it is **ORDERED** as follows:

1. The Nonmedical Defendants' Motion to Dismiss, ECF No. 61, is GRANTED; and

2. The Medical Defendants' Motion for Summary Judgment, ECF No. 63, is GRANTED.

A separate Judgment will enter herewith.

ENTER: October 24, 2022

/s/ JAMES P. JONES
Senior United States District Judge